And Ms. Watson, would you call our next case, please? 15-3031, People v. Torero v. Phagan All right, and will counsel on People v. Phagan please approach? Tell us who you are and who you represent. Good morning, Stephen Gentry from the State Appellate Defender's Office representing Mr. Phagan. Assistant State Attorney Nina Kelly on behalf of the people. All right, and Mr. Gentry, how much time would you like? I don't anticipate I'll need more than 10 minutes, Your Honor. All right, little for rebuttal? A couple of minutes for rebuttal. All right, and Ms. Kelly? About 15 minutes, Your Honor. Okay. All right, Mr. Gentry, whenever you're ready, please keep in mind we have read the briefs. We're familiar with your arguments. Thank you. Again, Stephen Gentry representing Torero-Phagan this morning. Mr. Phagan was convicted most significantly of two counts of attempted first-degree murder of a peace officer while discharging a firearm. He's also convicted of other charges relating to the earlier theft of a van. He was acquitted of two other counts of attempt first-degree murder of a peace officer involving other officers. The evidence at trial showed extensively that Mr. Phagan was in a van he did not have authority to take. And he led police on a chase throughout much of Chicago in the early morning hours. Testimonial evidence, as well as extensive ballistics evidence, showed that numerous officers fired numerous shots at the van during this chase. However, it was only the testimony of police officers that established Mr. Phagan's possession of a firearm during this pursuit. Mr. Phagan admitted that there was a firearm in the vehicle when he was ultimately stopped, but claimed that, who was it, the little man threw it in there? Your Honor, Mr. Phagan had an explanation that differed from the owner of the van as to how he took possession of the van. Both were in agreement that a gun was involved. Each one claims that the other side was the one using the gun. Mr. Phagan, on his part, said that as he was pulling away in the van, one of the other people stuck a gun through the window and fired at him. But there was no, there was no testimony, there was only the two officers for whom Mr. Phagan was convicted of attempt murder that testified that he had fired the gun. And so it was, none of the ballistics evidence corroborated any shots having been fired by Mr. Phagan. None of the... Over how long did this police chase take place, both time-wise and length-wise? It appeared to take place over about a half an hour. And again, it was throughout much of Chicago, I don't know that the mileage was put in. But somewhere I read about 11 miles. I would not dispute that. What I'm getting at is numerous witnesses say they saw Mr. Phagan with his arm out the window, something silver in his hand. That is correct, Your Honor. So the fact that they ultimately did not recover jackets or spent bullets over an 11-mile area isn't very surprising, is it? Well, Your Honor, numerous ballistics evidence was collected in this case, corroborating that the officers had fired on the van. And thus it was a stark contrast to that evidence that no ballistics evidence was recovered showing that Mr. Phagan had fired at these officers. The two that testified that he fired at them said that he fired right directly at them. And yet their car sustained no damage. The officers sustained no damage. No officers or police vehicles sustained any damage. And Mr. Phagan's theory was that the officers made up this story about him pointing a gun and firing at them to justify their own. It certainly appeared that that was the defense. And while Mr. Phagan is not on appeal challenging the sufficiency of the evidence to convict, it was in the context of this evidence. And again, there was DNA testing, fingerprint testing, gunshot residue testing. None of these corroborated that Mr. Phagan fired the gun. Well, there was gunshot residue on his shirt. But nobody could tell what gun that was from or when that gun was fired. Correct, Your Honor. And that would have been consistent with Mr. Phagan's testimony as to how he took possession of the van. So the argument then, while not a challenge to the sufficiency of evidence, was that in the context of this evidence, where only the police testimony, as opposed to the objective evidence, showed that Mr. Phagan fired this weapon, that it was reversible error for the state to say in closing argument that, and I quote, the defendant is literally caught at 3001 South King Drive in the stolen vehicle with the smoking gun. Counsel's objection to smoking gun was overruled by the court. And this was an error. It's a phrase that's well known. It is a phrase that's well known. It's usually used as a metaphor for something other than an actual smoking gun. And here the state uses the word literally. Well, that's your interpretation. I think another interpretation is that the gun wasn't really smoking, but they found a gun. So it could be both ways. So that makes it ambiguous. Your Honor, it's true, and the argument is that, in light of this evidence, it was an error for the state to use this metaphor for the exact same thing that it's a metaphor to describe in this case. To potentially confuse the jury. There's no indication they did confuse the jury, is there? Your Honor, there is a reasonable probability that the jury was confused here. And for that reason- Confused that the gun was actually smoking? Yes, Your Honor. Where the state is getting up in front of them and saying that literally, the defendant was caught at this location in the vehicle with the smoking gun. The state is telling the jury, we are not using a metaphor. This is literally what happened. And that's not literally what happened. The gun had been fired, but there's no evidence that it had been fired recently. There's nothing to say when it was fired, how long ago it was fired. I mean, I'm not even sure the evidence showed. It had five fired shot casings and one unfired bullet. But nobody could prove when those fired bullets were actually fired. That's correct, and no one could prove where they were fired either, because there was no ballistics evidence recovered. Similarly, it was also an error for the state not only to misconstrue the evidence, but then to bolster the police credibility and attack the defense credibility in their closing argument. First by saying, as to the police, we need the police. They're out there serving and protecting. They run in when we run out. This was improper in that it was attempting to bolster the credibility of the police based on their status as officers. Well, let me say it quick. That was during rebuttal. Correct. And the police could have called him during their case in chief, is that correct? That officer, the officer that they called during rebuttal. The state could have called him during their case in chief. You're talking about the rebuttal evidence. Mm-hm. The state did not call the rebuttal evidence testifying officer, but that's not, I mean, that speaks, I guess, to the overall evidence. But the statement that you're referring to, I would just point out, was not reduced to writing, nor was it videotaped, the officer's rebuttal test. The chase started at about 2 AM. Correct. I have to tell you, I've totally forgotten what time he was actually arrested. But the gunshot rescue test was taken at 3 57, so it's not days later, it's- It's within the six hour window. Within a couple hours. Yes, sir. And then, lastly, the state committed misconduct. When it said, ridiculed the defense testimony, using the word, it's ridiculous, saying it's ridiculous what he told you, don't believe it for a second. He has so much to lose, that's why he's doing it. It was improper for the state to make reference to the punishment that- How does saying the obvious, that he has so much to lose, either he's convicted or found not guilty, how does that say anything about punishment? What he has to lose is, in fact, what he stands to lose from the punishment. And I would compare this case to- Every jury knows that a defendant who chooses to testify and tell a story that's at variance with the evidence presented by the prosecution, has something to lose. They're either going to be found not guilty or they're going to be found guilty. That is true, Your Honor. But it's improper for the state to attack the defendant's credibility on that basis. Well, they called him a liar. They did. They said it's ridiculous. Don't believe what he had to say for a second, because he has so much to lose. Yeah, but this argument was not in your post-trial motion, was it? Your Honor- It's forfeit. Your Honor, I disagree that it was not included in the post-trial motion. Where was it? The post-trial motion made reference to the state ridiculing the defense, and it also made reference to the court overruling objections to argument. So both of these are references. Credibility, the witness's credibility. Your Honor, my assertion is that this is what that was referring to. Can I ask you to move on to the 20-year firearm enhancement argument and tell me why Douglas is good law and Smith and Tolentino are not? Yes, Your Honor, and thank you. Douglas is persuasive here for the terms that it presents. And I would say that Tolentino and Smith, and also the more recent case of Jackson, which has since been decided since the briefing, which go against the defense's position here. I would say, looking at the enhanced sentence for attempt murder of a peace officer, that extends the term of years range up to 80 years, which at 85% is a de facto life sentence for any defendant. So there's actually no purpose for the legislature to seek to actually expand the range for attempt murder of a peace officer, and so that's consistent with the outcome of Douglas. Similarly, the fact that each of these subsections are divided by semicolons, each of the separate firearm enhancements and the peace officer enhancement makes it appear that they are each alternative enhancements. And again, there would be no purpose to extend it beyond 80 years anyway. The state says, if you're right about that, then in any given case, a court could impose more than one enhancement. You could impose the 10 year for being armed with a firearm, the 15 year for discharging a firearm, the 20 year for causing great bodily harm. But I've never seen a case where a trial court did that, impose more than one enhancement. Exactly, Your Honor, by the logic of Tolentino and Smith. But I mean, I guess the point of my question is, when you say they're all separated by semicolons, so they're all separate. That would say to me that you would be arguing that all these enhancements can be applied in the same manner in a single case. Well, Your Honor, certainly I'm not arguing that all four enhancements can be applied in the same case. Certainly, it is never the case that we see multiple firearms enhancements being stacked on top of each other. And for that same reason, where they're set forth in the exact same subsections under the exact same section, the peace officer enhancement and firearm enhancements should not also be stacked. If there are no further questions, I'll yield to the state. I didn't mean to cut you off, Mr. Gentry. If you have any other arguments you'd like to present? No. Okay. Thank you. All right, Ms. Kelly. Good morning, and may it please the court. My name is Nina Kelly on behalf of the people of the state of Illinois. First, I would like to reiterate, as defense counsel did concede, that this is not a sufficiency of the evidence claim. We don't need physical evidence to prove defendant had a gun. There was ample testimony from various police officers that was very credible. That defendant did, in fact, have a gun. They saw him. They saw him shoot at them. We don't need gunshot residue or bullets to prove it. Moreover, yes, we did have the police officer's shells after, because police officers, that is their job to carry a firearm. They know to remember where exactly they shot at defendant. Defendant was shooting out the window. Who knows where his bullets went? We don't need to have those to prove the defendant had a firearm. As to the prosecutor's remarks, the people contend that they were proper, because they were proper inferences from the evidence, and they in no way misstated the evidence presented. None of the comments, either individually or cumulatively, would result at all in any substantial precedent. But if they said literally, literally smoking, that's kind of hard to believe that the gun was smoking when they got to the car. Yes. I mean, literally, it has a certain meaning. Well, actually, it has two meanings now. First, I would like to point out that while defendant corrected it in his reply brief, in the original brief, he was misstating the record over and over, saying that the prosecutor said he was literally caught with a smoking gun. Prosecutor did not say that. Prosecutor said defendant was literally caught at the address, 3001 South King Drive, in the stolen vehicle with the smoking gun. So it could be argued that he meant he was literally caught in the stolen vehicle, all which was proven. Moreover, if we are going to get into the semantics, the word literally actually now, by definition, means figuratively and literally. So it's literally- Corruption of the English language. And I would agree with you, Your Honor, but unfortunately, it's the world we live in. The word literally, even if it were to be carried over to smoking gun, it would be ridiculous to claim that we have to assume all the jurors had to believe the gun actually had smoke coming out of it. We had testimony the gun had been recently fired and recently fired multiple times, and it was disingenuous to claim. And quite frankly, it belittles these jurors to think that we have to assume they thought the gun was smoking. And case law indicates we do not have to assume the jury took the most damaging interpretation of anything the prosecutor said. Second, none of the prosecutor's statements regarding what the police did were improper because it was not a voucher for their credibility. But when the prosecutor stated the things about the police, it was in rebuttal and it was in direct response to what was provoked by defendant's closing argument. In defendant's closing argument, he was saying that he was running away from police who were shooting at him for what he claimed was no reason whatsoever. And in response, the prosecutor was saying, no, this is their job. They run in when we run out. They are trying to protect us. They are trying to protect the community from this guy who just stole a car and was shooting bullets all over the city. That is in no way a credibility voucher. And we maintain the record makes it clear that it was not contextually relevant because it was brought up in rebuttal. Lastly, as to defendant's claims regarding prosecutorial conduct, defendant's story of events was, I'm sorry, defendant gave a story that whether or not the jury might believe it on the stand or not, did not seem credible. And then we had that to compare to all of the other evidence, including multiple officers, stating the story happened a completely different way. And we had an officer who came and claimed that defendant had given three prior statements that completely morphed each time. The story went from not stealing the car, to having someone else in the car, to having a little man drop the gun in the car, to I thought I ran over a little man and they were chasing me for that, to I have no idea why they're chasing me. And the prosecutor can comment on the credibility of defendant's story, as long as it comes from the evidence, and that's exactly what we have here. But does that argument forfeit it? Your Honor, we would claim that it was, but even if it wasn't, we find that the comments were so proper anyways, that I'll happily argue it. People v Griffiths is directly on point when this court found the prosecutor stating the defendant had the most to lose was also a proper argument. Yes, right now the prosecutor said he had so much to lose. In People v Griffiths, it said saying that he had the most to lose was proper, because it was talking about defendant's motive to testify. The prosecutor was telling the jury, this defendant had a motive to lie to you, because he has much to lose, or the most to lose. It was not, the prosecutor did not bring up the defendant's sentence at all. Every jury, as Your Honor stated, understands that when the defendant loses, there's going to be one form of punishment or another. But commenting on his completely incredible story is not an improper argument. And as that court held in People v Runge, I would just like to reiterate that reviewing courts will find reversible error only if the defendant demonstrates  that the verdict resulted from the error, which we so clearly do not have here of any of the three arguments. As to the other argument that defense counsel brought up, defendant's second claim may seem more compelling because of what I like to call the sticker shock of a long sentence. But his claim fails both statutorily and under the case law regarding the firearm enhancement, due to the straight facts of what he was convicted of and what the statute says. This court has already overruled Douglas twice by Tolentino and Smith. Well, we don't overrule each other. We can disagree with each other, but we don't. Only the Supreme Court can overrule us. Correct, I apologize. But since, it has been since Douglas that Tolentino and Smith have both come after Douglas, acknowledged Douglas. But both of those cases, including Douglas, was a different statute, correct? It's been amended. Well, it's amended. My question is, it's been amended. Correct, the statute has been amended. So, it was amended, and they added a section E, correct? Correct. Okay, in your opinion, does section E change our analysis at all? No, not at all, because we're still only talking about A and C. And if we want to get into the plain language of the statute, I'd like to look right at it. A, which is increasing the actual range, says, the sentence shall be a term of imprisonment of not less than 20 years, and not more than 80 years. A is clearly increasing the range, just saying it shall be a term of. And C is, I'm sorry, firearm is a class X felony for which 20 years shall be added to the term. So A provides you with the term for attempting to shoot a peace officer. Then C is adding 20 years to that term. Council also brought up semicolons, saying that that means they should be mutually exclusive, which I would completely disagree with, because of the word and in between D and the recently added E. These are semicolons, and it is the word and, not the word or. So the legislator's clear intent was that if the trial court could do both A and C. There's also a clear policy issue here, where the legislator could obviously want to both try to deter people from trying to kill peace officers, which gives you the higher range, and from trying to use a firearm while doing so. You can try to kill a peace officer without using a firearm. That doesn't, I mean, it doesn't really make a lot of sense, does it? When A talks about specifying self-hare as 1, 2, and 12. It goes up to as much as 80 years, okay? So there has to be a difference in A and C. They're just talking about a person personally discharged a firearm as a class X felony for which 20 years shall be added. So, I mean, there is a difference between A and C. Exactly. But to say that you can just pick and choose all of them, can you just keep adding and adding? What about, could you add D then? I wouldn't want to argue whether or not B, C, D, and E could be together, because that's not what the case is. No, but let's talk about that. Because once we go down this road, then what we're saying is you can add A, B, C, and D. Technically, yes. I think because there's semicolons in the word and, the legislator could have used the word or, they could have made these completely different numbers. But they are semicolons, and they are the word and. So if we look at this statute, the legislature did intend, if the trial court wanted to, it could have imposed all these. So for being armed with the firearm, he gets the 10 year. For shooting in the direction of somebody, he gets the 15 year. And for actually causing great bodily harm, he gets the 20 year. So he's looking at, what, 35, 45 year enhancement in total? Have you ever seen a case where a trial judge has done that? I have not, and the trial court here didn't do that. But it would have been within the trial court's province to do so based on this statute. And if the legislature wants to change the statute, then they should. But as it is currently, there are semicolons in the word and. And I would like to reiterate again that this is A and C, where the shall be a term of imprisonment and added to the term of imprisonment, I cannot emphasize enough, clarifies that the term can be increased as well as having the 20 year enhancement. In rejecting Douglas, Tolentino clarified this, stating that the statute does not only not expressly prohibit using enhancements when also applying A, but the public policy concerns underlying subsection A differ from the concerns underlying firearm enhancements. They are two separate things. The court went on to say, a sentence applying both addresses the legislature's, and I quote, desire to deter intentional killings of peace officers and to discourage the use of firearms in the commission of felonies. They are two completely distinct and separate considerations. Therefore, based on the plain language of the statute and the case law, and I would like to emphasize that Tolentino and Smith did come after Douglas and refer to Douglas, the defendant does not raise any novel issues and his argument should be rejected. And for those reasons, we would ask that you affirm his conviction and sentence. Thank you. Thank you. Just a couple of notes in rebuttal, your honors. I would just like to, again, get back to the state's advocacy of a more casual use of the word literally in our courts. I agree it is a corruption of the language and it's a slippery slope if the state can literally say anything and have it supported or not by the evidence and excuse it by using the word literally, which traditionally has a meaning that means factually true. But I'm having a hard time understanding when the van is stopped, he's pulled out of the driver's seat, and at his feet is a gun. How is it unfair for the state to say literally or not, the gun's right there. There's the smoking gun. Doesn't everybody understand that that's hyperbole? Yeah, I'm not sure that they do understand that in this case, where the determinative question was not whether there was a gun found. Mr. Fagan agrees that there was a gun found at his feet, but he had an explanation as to how that could have been other than that he had been shooting at officers. And thus, it was an error for the state to overplay its hand of evidence, would in fact did not have a smoking gun. It did not have evidence that the gun had recently been fired. So it's the word smoking. Also, it was found at his feet rather than on his person. So in these ways, it was inappropriately used in this case. Plus, the video clips that were introduced to trial was, how long, I don't remember, how long was the chase? It was 11 miles, but how long? The chase was approximately a half hour, Your Honor. The video clips were much shorter. The video clips were from dash cams? There were pod cams and one dash cam. But there were no video clips of the van actually firing at any police? Absolutely not. There was no objective evidence. It was exclusively testimonial evidence of the officers. Theoretically, if the dash cams were operating correctly and the police were chasing this guy and he was shooting at them, somewhere on that half hour worth of tape. If the state had tape of him shooting him, they would have used it, would have been their strongest evidence. Certainly, Your Honor. But it appeared that most of the officers did not have dash cams. Finally, as to the statute, while it is our argument that the intent, or the plain language is clear, certainly the cases, and especially the most recently decided Jackson case, would seem to indicate that there is some confusion in this court's questions,  And in the event that this court finds that the statute is not plain in meaning, as Mr. Fagan argues, that this court would view the statute in the light most favorable to the defense. Those reasons we ask for a new trial, or in the alternative, sentencing would really be requested. Thank you. Thank you very much. Two minutes under 30 minutes. This is a momentous day. Thank you both for your briefs and your arguments here this morning. And we will take the matter under my advisement. Thank you. Court will stand in recess.